UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANNETTE TAYLOR,

        Plaintiff,                      CIV. NO. 15-10529

      v.                            HON. TERRENCE G. BERG

GENERAL MOTORS, LLC,

        Defendant.

_____/

## OPINION AND ORDER GRANTING DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT (DKT. 11)

This is an employment discrimination case, brought under Michigan's Elliot Larsen Civil Rights Act, Michigan's Persons with Disabilities Civil Rights Act, Michigan's Worker's Disability Compensation Act, and the federal Family and Medical Leave Act. Plaintiff Annette Taylor ("Plaintiff") is a 32-year employee of Defendant General Motors, LLC ("Defendant" or "GM"). Plaintiff alleges that Defendant unfairly disciplined her, overloaded her job, and unjustifiably forced her to take an 18-month medical leave of absence due to mental health concerns. Plaintiff claims that these actions were based on discrimination concerning her age and disability status, and were taken in retaliation for her exercise of her rights to worker's compensation and leave under the Family Medical Leave Act (FMLA).

Defendant has moved for summary judgment (Dkt. 11). Plaintiff filed a response (Dkt. 14) and Defendant filed a reply (Dkt. 21). The Court heard oral argument on Defendant's motion on October 21, 2015. For the reasons set forth

below, Defendant's motion for summary judgment is **GRANTED** and this case is

**DISMISSED WITH PREJUDICE**.

## I. BACKGROUND

At the outset, the Court notes that Defendant did not follow the Court's

practice guidelines in filing its motion for summary judgment. The Court's practice

guidelines for motions for summary judgment are available on the Court's website,

and provide as follows:

> A Rule 56 motion must begin with a "Statement of Material Facts." Such a Statement is to be included as the first section of the Rule 56 Motion. The Statement must consist of separately numbered paragraphs briefly describing the material facts underlying the motion, sufficient to support judgment. Proffered facts must be supported with citations to the pleadings, interrogatories, admissions, depositions, affidavits, or documentary exhibits. Citations should contain page and line references, as appropriate.... The Statement of Material Facts counts against the page limit for the brief. No separate narrative facts section shall be permitted.

> The response to a Rule 56 Motion must begin with a "Counter-statement of Material Facts" stating which facts are admitted and which are contested. The paragraph numbering must correspond to moving party's Statement of Material Facts. If any of the moving party's proffered facts are contested, the non-moving party must explain the basis for the factual disagreement, referencing and citing record evidence. Any proffered fact in the movant's Statement of Material Facts that is not specifically contested will, for the purpose of the motion, be deemed admitted. In similar form, the counter-statement may also include additional facts, disputed or undisputed, that require a denial of the motion.[1]

Defendant's motion for summary judgment failed to comply with the Court's

practice guidelines, as it did not provide a separately numbered "Statement of

Material Facts," but instead set forth a narrative statement of facts, which is

explicitly prohibited by the Court's practice guidelines. Because Defendant's motion

---

[1] Available at -- https://www.mied.uscourts.gov/index.cfm?pageFunction=chambers&judgeid=37

for summary judgment did not set forth the facts in numbered paragraphs, Plaintiff's response brief could not contain a "Counter-statement of Material Facts." Rather, Plaintiff's response brief set forth its own, somewhat disjointed narrative statement of facts, leaving many of Defendant's stated facts unaddressed. The failure to follow the Court's practice guidelines made it unnecessarily difficult for the Court to determine which material facts are, or are not, in dispute. Defendant is cautioned that any future filings that fail to comply with the Court's practice guidelines will be stricken from the docket.

The Court nonetheless conducted a thorough review of the factual record as well as the parties' briefs, oral arguments, and exhibits, and gleaned the following facts, which are viewed in a light most favorable to the non-moving party.

## MATERIAL FACTS

Plaintiff was hired in March 1984, and remains employed at GM's Hamtramck assembly plant. During her tenure with GM, Plaintiff has been an hourly worker and member of the United Auto Workers. The dispute in this case centers mainly on an 18-month involuntary medical leave, which Defendant contends was necessitated by Plaintiff's own disruptive behavior. Plaintiff also claims that Defendant unjustly disciplined her, and overloaded her job. Plaintiff contends that Defendant's actions were discriminatory based on her age and disability, and were taken in retaliation to her exercise of worker's compensation and FMLA rights.

In November 2011, Plaintiff began working in the "kitting area" of GM's Hamtramck assembly plant (Dkt. 1 ¶ 8). This job involved putting parts in boxes that are sent to employees to be used on the vehicle assembly line (Dkt. 11, Ex. A, Plaintiff's Deposition at 31-32). Throughout her time working in the kitting area, Plaintiff believes that Defendant intentionally overloaded her with work because of her age (*Id.* at 26-27). More specifically, Plaintiff claims that in 2012 Defendant "expanded" her job and she was required to feed parts to three people, rather than two (*Id.* at 30, 50). Plaintiff told her supervisor, Melissa Toupin, that her job was overloaded, and Toupin provided additional personnel to assist Plaintiff; however, the plant business manager, Chuck Bazzi, later removed the extra personnel (*Id.* at 51).

Subsequently, Celso Duque, a UAW industrial engineer, conducted a time analysis on the job Plaintiff was performing (Dkt. 11, Ex. C, Duque Depo. at 5, 14-15). Although Duque found that Plaintiff could not complete the job within the required "cycle time," he also observed that a temporary employee performing the same job was able to complete it within cycle time (*Id.* at 22, 25). Duque observed that Plaintiff took longer than the other operator when working with the manifest, which is the document that indicates which specific parts go into each part kit (*Id.* at 17-18). On January 18, 2013, Plaintiff filed a grievance because no additional personnel support had been provided to her after Duque's analysis (Pl.'s Depo. at 52-53). Plaintiff does not know the outcome of that grievance (*Id.*).

During her deposition, Plaintiff identified two employees performing the

same job she did, whom she believes received more job support.  One of those employees is "Roxanne" (last name unknown) who Plaintiff believes is about the same age as Plaintiff and has a disability (*Id.* at 55).  The other employee is "Mike" (last name unknown), a new hire who was purportedly younger than Plaintiff (*Id.* at 77).  In addition, Plaintiff claims that, in or around January 2013, she told Charlie MacDonnell, the plant's quality operations manager, that her job was overloaded and requested help, and that MacDonnell suggested she should find a different job or consider retirement (*Id.* at 60-62).  MacDonnell denied making the comment alleged by Plaintiff (Dkt. 11, Ex. G, Declaration of Robert Tarrant ¶ 3; MacDonnell Depo. at p. 10).  Plaintiff also alleges that plant labor relations supervisor Robert Tarrant told her five or six times, "you are getting to the point where you can't remember what you do" (Pl.'s Depo. at p. 64).  Plaintiff says Tarrant "always" made that comment when they were discussing discipline issued to Plaintiff, such as the suspension she received for failing to follow standardized work procedures (*Id.* at 65).  On Tarrant's part, he does not recall ever making that comment to Plaintiff (Tarrant Depo. at 49).  Plaintiff never complained to GM about the comments she alleges were made by MacDonnell and Tarrant (Pl.'s Depo. at 63, 66).

On or about November 12, 2012, Plaintiff injured her right knee, striking it on a rack while she was pushing two carts loaded with parts (*Id.* at 158).  Plaintiff went to Defendant's medical department that day, received ice for her knee, and resumed working (*Id.* at 159).  Plaintiff's knee worsened over the following days, and Defendant sent her to Detroit Receiving Hospital where she was given pain

medication and a referral to a specialist, Dr. Joseph Salama (*Id.* at 161). However, Plaintiff did not make a claim for worker's compensation benefits for this injury at the time when it occurred and she was treated, in November or December 2012. Plaintiff did not apply for worker's compensation benefits until February 2013, after she had begun serving a mental health leave of absence. The circumstances of Plaintiff's mental health leave absence are described in greater detail below. Plaintiff's February 2013 claim for worker's compensation benefits for her knee injury was denied, and she did not appeal that denial (*Id.* at 169).

As to Plaintiff's claims regarding her FMLA leave, the time-line begins in August 2010. At that time, Plaintiff was approved for and took intermittent FMLA leave to care for her ailing mother (*Id.* at 176-177). She continued to take intermittent FMLA leave from that point forward. Most relevant to this case, on January 14, 2013, Plaintiff applied for a paid vacation day to be used on January 23, 2013, and on January 16, 2013, Plaintiff applied for a paid vacation day to be used on January 24, 2013, both days in order to care for her mother (*Id.*). Plaintiff told her supervisor, Melissa Toupin, that she needed the days off because her mother was having surgery, and she wanted to use vacation days concurrent with her FMLA leave so that she would be paid for the days she was off work (*Id.* at 174-175). Chuck Bazzi, the plant's business manager, approved both of Plaintiff's vacation days on January 17, 2013 (*Id.* at 175). On January 22, 2013, however,

6

Plaintiff received a one-week suspension for failure to do standardized work[2] (*Id.* at 178).  Because she was on suspension on January 23 and 24, 2013, Plaintiff was not permitted to use paid vacation time for her absences on those days (*Id.* at 178-179). It appears, however, Plaintiff was permitted to use FMLA leave for these days off; she just was not paid during her absence.

Plaintiff returned to work, and on February 6, 2013, Plaintiff attended an employee group meeting (*Id.* at 106).  During this meeting, Robert Tarrant, the plant's labor relations supervisor, asked Plaintiff to apologize to her co-workers.  It is unclear from the record precisely why Plaintiff was being asked to apologize to her coworkers; indeed, Plaintiff testified during her deposition that she did she "didn't have anything to apologize for" (*Id.* at 106).  What is undisputed in the record, however, is what happened after Plaintiff was asked to apologize to her co-workers.

According to Troy Fisher, a witness to the February 6, 2013 team meeting, Plaintiff got into a verbal altercation with a co-worker, Margaret Tatum (Dkt. 11, Ex. D, Fisher Depo. at 12-21; Pl.'s Depo. at 102-104).  Fisher stated that both Plaintiff and Tatum were yelling, but that Plaintiff "cut-off" Tatum and "escalated" the situation (Fisher Depo. at 18-19).  Plaintiff admits that she yelled during the dispute (Pl's Depo. at 104).  Melissa Toupin, the "group leader," discussed the incident with Tatum, who indicated that Plaintiff came into the meeting accusing her co-workers of lying, conspiring to have her disciplined, and sabotaging her job,

---

[2] "Standardized work" at GM involves specific instructions and processes that employees are mandated to follow when doing their jobs (*Id.* at 90-91).

and that when Tatum tried to respond to Plaintiff's accusations, Plaintiff yelled at her (Dkt. 11, Ex. E, Tarrant Depo. at 20; Tarrant Depo. Exh. 2). After completing interviews of those present at the group meeting, Tarrant notified Plaintiff that she was being suspended for causing disruptions at the workplace and for code of conduct violations (Pl.'s Depo. at pp. 105-107; Tarrant Depo. Exh. 4).

As Tarrant was walking Plaintiff out of the plant, Plaintiff turned into the Plant Manager's office and said she wanted to speak with the Plant Manager (Pl.'s Depo. at 107-108). Tarrant told Plaintiff she could not speak to the Plant Manager and needed to leave the premises; Plaintiff refused to leave and instead sat down in a chair in the waiting area outside the Plant Manager's office (*Id.* at 108). Plant Security then arrived and asked Plaintiff to leave, but she again refused (*Id.* at 108-109). Next, several union officials arrived and told Plaintiff to leave, but she continued to refuse to leave the plant (*Id.* at 109). At that point, Plaintiff was warned that if she did not leave, the Detroit Police Department would be called to remove her (*Id.* at 109-110). Plaintiff still refused to leave, and the Detroit Police were called to the scene (*Id.* at 110). When the police arrived, Plaintiff told them "if you want me to leave, you're gonna have to handcuff me;" the police officer obliged, handcuffed Plaintiff, and removed her from the plant (*Id.* at 110-111).

As a result of this incident, Defendant informed Plaintiff that she would be required to provide a full evaluation from a mental health care provider establishing her fitness for duty prior to returning to work, and that any evaluation she provided would be reviewed by a GM psychiatrist, consistent with the collective

8

bargaining agreement (CBA) between GM and Plaintiff's union (Tarrant Depo. at 34; Tarrant Depo. Exh. 4).

On February 13, 2013, Plaintiff went to see her own treating physician – Dr. Thomas Park.  On or about March 6, 2013, Plaintiff provided Defendant a note from Dr. Park stating that Plaintiff "has been medically disabled from 2/7/13 to 3/9/13 with DX of . . .adjustment disorder with anxiety . . . can return to work on 3/11/13 without any restrictions" (Dkt. 11, Ex. A, Pl.'s Depo. at 115; Ex. 10). Tarrant sent this note to a GM psychiatrist, Dr. Donald Jones, who indicated that a full psychiatric evaluation, rather than just a conclusory doctor's note, was required in order to determine Plaintiff's fitness to return to work (Dkt. 11, Ex. E, Tarrant Depo. at 26; Pl.'s Depo. at 118-119).

On or about April 5, 2013, Dr. Park provided GM a more detailed evaluation of Plaintiff, which concluded that Plaintiff could return to work without restrictions on April 8, 2013 (Dkt. 1, Ex. A, Pl.'s Depo. at 118-119; Pl.'s Depo. Ex. 11). Defendant, however, did not permit Plaintiff to return to work based on Dr. Park's evaluation alone. Rather, as provided for in the CBA, Defendant required Plaintiff to be evaluated by a psychiatrist selected by GM.

On April 12, 2013, Dr. Jones – GM's Psychiatric Consultant – conducted an assessment of Plaintiff (*Id*. at p. 134).  Subsequently, GM concluded that Plaintiff was not fit for duty and sent Plaintiff a letter notifying her of that decision on April 26, 2013 (*Id*., Ex. 14).  That letter also informed Plaintiff that, because GM's finding regarding Plaintiff's fitness for duty was in conflict with the findings provided by

9

Plaintiff's doctor, a binding Independent Medical Examination (IME) had been scheduled pursuant to Paragraph 43(b) of the GM-UAW National Agreement (*Id*; Tarrant Depo. at 46-47).

On May 16, 2013, Plaintiff was evaluated by Dr. Harvey Ager, an independent psychiatrist jointly agreed to by GM and the UAW (Dkt. 1, Ex. A, Pl.'s Depo. Ex. 15; Dkt. 11, Ex. F, Czape Depo. at 16-17).  Dr. Ager concluded that Plaintiff had paranoid personality disorder and, possibly, paranoid disorder (Pl.'s Depo. Ex. 15). Dr. Ager also indicated that: (1) if Plaintiff were to return to work, she may act out again and would disrupt the workplace and create chaos and conflict amongst her team members and others; and (2) he did not view her as a good treatment case, and her prognosis was not good (*Id*., Ex. 15).

Subsequently, GM informed Plaintiff that, based on Dr. Ager's independent evaluation and pursuant to Paragraph 43(b) of the CBA, she could not return to work (*Id*., Ex. 16).  Plaintiff asked for additional explanation regarding this decision, which Defendant provided in a June 19, 2013 letter (*Id*., Ex. 17).  That letter outlined the steps necessary for Plaintiff to return to work, which included securing additional medical treatment and successfully demonstrating her recovery and fitness for duty (*Id*.).  Plaintiff was also notified that additional findings from her physician would be subject to review by GM and, if not acceptable to GM, another independent medical evaluation would be scheduled (*Id*.).

Eight months later, on February 24, 2014, Plaintiff's doctor – Dr. Park – provided return to work papers to GM, including a letter stating that Plaintiff "has

10

no mental health issues at all" and was able to return to work without restrictions on March 1, 2014 (Pl.'s Depo. at 138; Ex. 18). GM's psychiatrist – Dr. Jones – again disagreed with Dr. Park's determination, so Plaintiff was scheduled for a second independent psychiatric evaluation, which was conducted by Dr. Michael Freedman on July 7, 2014 (*Id*. at p. 143; Ex. 19). Dr. Freedman concluded that Plaintiff was able to return to work without restrictions (*Id*., Ex. 19). As a result, GM returned Plaintiff to work on or about July 28, 2014, placing her in the same job she had before she went out on leave (*Id*. at pp. 151, 156). Plaintiff is still actively working in that same job today.

## II. ANALYSIS

### A. *The Standard for Summary Judgment*

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). On a motion for summary judgment, the Court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Edward*, 241 F.3d 530, 531 (6th Cir. 2001).

The moving party has the initial burden of demonstrating an absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325

11

(1986).  If the moving party carries this burden, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587.  The Court must determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to a jury or whether the moving party must prevail as a matter of law.  *See Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff").

Moreover, the trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989).  Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001).

### B. *Age Discrimination Claim Analysis under the ELCRA*

Plaintiff first alleges that Defendant intentionally overloaded her with work because of her age.  She also points to the two comments[3] allegedly made to her by supervisors as direct evidence of age discrimination.

---

[3] That MacDonnell suggested she should find a different job or consider retirement (Pl.'s Depo. at 60-62), and that that Tarrant told her five or six times, "you are getting to the point where you can't remember what you do" (*Id.* at 64).

12

Although Michigan substantive law governs this action, ELCRA age discrimination claims "are analyzed under the same standards as federal ADEA claims." *Gieger v. Tower Automotive*, 579 F.3d 614, 626 (6th Cir. 2009) (citation omitted); *see also Meager v. Wayne State Univ.*, 222 Mich. App. 700, 709 (1997). Plaintiff may establish age discrimination by presenting either direct or circumstantial evidence.[4] *See Gieger,* 579 F.3d at 620.

First, Plaintiff points to the two comments allegedly made by MacDonnell and Tarrant as direct evidence of age discrimination. The standard for establishing direct evidence of discrimination is high. "Direct evidence of discrimination is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc) (internal quotation marks omitted). Direct evidence thus requires no inference to prove the existence of a fact while circumstantial evidence "is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Id.* In the context of age discrimination, "'only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age,' satisfy this criteria." *Scott v. Potter*, 182 Fed. App'x 521, 526 (6th Cir. 2006) (quoting *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989)).

---

[4] "Direct evidence of discrimination is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (internal quotation marks omitted). "Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Id.*

As to MacDonnell's alleged statement that Plaintiff should consider getting a new job, or retiring, the terms "retire" and "retirement" alone, without any evidence that they are being used as a proxy for age to express discriminatory bias, are not direct evidence of age discrimination. *See, e.g., Scott*, 182 Fed. App'x at 526-27 ("Why don't you retire and make everybody happy?" is not direct evidence of age discrimination where there is no evidence that term was used as a proxy for "too old" or some other derogatory, age-based term); *Hale v. ABF Freight Sys., Inc.*, 503 Fed. App'x 323, 331 (6th Cir. 2012) (retirement alone insufficient, claimant's age must be "unequivocally link[ed]" to the adverse employment action); *Lefevers v. GAF Fiberglass Corp.*, 667 F.3d 721, 724 (6th Cir. 2012) ("questions concerning an employee's retirement plans do not alone constitute direct evidence of age discrimination"; general statements about an employee's age and impending retirement are not direct evidence because they are not linked to the termination decision). As to Tarrant's alleged statement – that Plaintiff was "getting to the point where she can't remember what to do – this statement does not rise to the level of a blatant remark evidencing a discrimination against Plaintiff based on her age. As such, the Court finds, based on the evidence presented, that Plaintiff has not adduced sufficient direct evidence to support a viable claim of age discrimination against Defendant.

To the extent Plaintiff relies on circumstantial evidence, the analysis of her discrimination claim under the ELCRA is guided by the burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *See*

14

*Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 818 (6th Cir. 2011); *see also Lytle v. Malady,* 458 Mich. 153, 171-75, 173 n. 19 (1998); *Hazel v. Ford Motor Co.*, 464 Mich. 456, 462-64 (2001).  Under the *McDonnell Douglas* framework, Plaintiff must first establish a prima facie case of discrimination by a preponderance of the evidence. *See Lytle*, 458 Mich. at 172.  If Plaintiff does so, a presumption of discrimination arises and the burden then shifts to Defendant to assert a legitimate, non-discriminatory reason for taking an adverse employment action against Plaintiff. *Id.* at 173.  Plaintiff may then respond with evidence that Defendants' proffered reason is a mere pretext for discrimination. *Id.* Plaintiff can rely on the same evidence to prove both pretext and discrimination as long as the evidence would enable a reasonable fact finder to infer that the employer's decision had a discriminatory basis. *See id.* at 178.

The *McDonnell Douglas* test, as adopted by the Michigan Supreme Court in ELCRA age discrimination cases, "is not to be applied mechanically, but with due deference to the unique facts of the individual case." *Lytle*, 458 Mich. at 173 n. 19. Plaintiff always retains the "burden of persuading the trier of fact that [Defendants] intentionally discriminated" against her. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Under the ELCRA, however, Plaintiff does not need to establish that her age was ***the*** reason for the adverse employment action. The ultimate question in the context of summary judgment is whether age was ***a*** motivating factor in the adverse employment action. *See Lytle*, 458 Mich. at 175-76.

Under the relevant case law, Plaintiff's age discrimination claim fails for several reasons.  First, Plaintiff has not established that she was subjected to any adverse employment action. As a matter of law, Plaintiff's allegation of job "overloading" or "expanding," even if true,  is simply not actionable as an "adverse action" that can give rise to a viable age discrimination claim. "'[M]ere…alteration of job responsibilities" is not sufficient to constitute an adverse employment action." *Lossia v. Detroit Bd. of Educ.*, 2013 WL 393181, *8 (E.D. Mich. Jan. 31, 2013) (quoting *Spees v. James Marine, Inc.*, 617 F.3d 380, 391 (6th Cir. 2010)); *see also Jones v. Donahoe*, 2013 WL 4042039, *3 (W.D. Ky. Aug. 8, 2013) ("A substantial increase in work load alone does not qualify as a materially adverse change").

Second, in order to show age discrimination, Plaintiff must present evidence of similarly situated younger employees who were treated more favorably than she was.  Plaintiff fails to do this.  She identifies, by first name only, two employees who she believes received more job support – "Roxanne" and "Mike."  As to Roxanne, Plaintiff stated there is no significant age difference between herself and Roxanne. This does not show that a younger employee was treated more favorably.  While Plaintiff does at least allege that Mike is younger than she, the record is bereft of any evidence supporting this contention. Indeed, there is no evidence regarding who "Mike" is, what his work circumstances or job duties are, or whether any other factors that could establish how he is similarly situated to Plaintiff.  As a result, Plaintiff has failed to establish a prima facie case of age discrimination.  To be deemed "similarly situated", individuals with whom Plaintiff seeks to compare her

16

treatment must have dealt with the same supervisor, been subject to the same standards and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. *See Mitchell v. Toledo Hospital,* 964 F.2d 577, 583 (6th Cir. 1992). Plaintiff's vague references to "Mike" and "Roxanne" are not sufficient to show that these employees were similarly situated to Plaintiff, yet treated more favorably than she was.

Finally, Plaintiff acknowledges that the alleged overloading impacted all the employees in Plaintiff's group (Pl's Response Brief, Dkt. 14 at 15, 16, 21) (citing team leader's deposition testimony that "[w]e're all overloaded") ("everyone on the line talked about the work being overloaded"), and (citing testimony that "everyone's job was being overloaded"). Accordingly, Plaintiff concedes that she was treated no differently from any other similarly situated employees, which is fatal to any attempt to establish a prima facie case of discrimination. For all these reasons, Defendant is entitled to summary judgment on Plaintiff's age discrimination claim.

### C.    *Plaintiff Cannot Establish a Prima Facie Case of Disability Discrimination*

Plaintiff also alleges that GM overloaded her job, subjected her to unwarranted discipline, and required her to be on leave, all because of various physical disabilities or a perceived mental disability. Further, Plaintiff claims that GM discriminated against her on the basis of a perceived mental disability when it

17

suspended her and placed her on medical leave pending psychiatric evaluation on February 6, 2013 (*Id*. at 96).

Michigan's PWDCRA guarantees to all persons the right to be free from discrimination on the basis of a disability, as that term is defined.  Defining its primary objective, the PWDCRA provides in pertinent part: "(1) [t]he opportunity to obtain employment ... without discrimination because of a disability is guaranteed by this act and is a civil right. (2)[A] person shall accommodate a person with a disability for purposes of employment . . . unless the person demonstrates that the accommodation would impose an undue hardship." Mich. Comp. Laws § 37.1102. The PWDCRA further provides that an employer shall not "[d]ischarge or otherwise discriminate against an individual with respect to compensation or the terms, conditions, or privileges of employment, because of a disability that is unrelated to the individual's ability to perform the duties of a particular job or position." Mich. Comp. Laws § 37.1202(1)(b).

It is not considered discrimination under the PWDCRA to refuse to accommodate an employee whose disability is directly related to the employee's ability to perform the duties of her job. *See Carr v. General Motors Corp*., 425 Mich. 313, 323 (1986) (holding that an employee whose disability is related to his ability to perform the duties of his position is not disabled under the act and therefore an employer has no duty to accommodate).  Noting that many types of accommodation required by the act are unrelated to ability to perform, such as wheelchair ramps, wide doorways or hallways, raised numbers for the blind, adopting alternative

18

testing measures for disabled individuals, reassigning parking or office locations, the Michigan Supreme Court in *Carr* refused to adopt the appellate court's reasoning that the PWDCRA is meaningless without accommodation related to disability: "The Legislature has spoken clearly and has mandated, not just once but many times throughout the HCRA [the predecessor act to the PWDCRA] that the only handicaps covered by the act, for purposes of employment, are those unrelated to ability to perform the duties of the position." 425 Mich. at 321–22. Thus, a "successful claim under the [PWDCRA] requires a finding that plaintiff is physically limited in a way *unrelated* to h[er] ability to work." *Kerns v. Dura Mechanical Components, Inc.*, 242 Mich.App. 1, 17 (2000) (emphasis added).

Plaintiff argues (Dkt. 14) that her perceived disability discrimination claim is based solely on GM's decision to keep her on medical leave despite her personal health care provider's declaration that she was fit to return to active employment. This claim fails however, because numerous courts have recognized that employers do not run afoul of the disability discrimination laws merely by asking an employee to undergo a mental health evaluation in response to observed behaviors.  *See, e.g., Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 810 (6th Cir. 1999) ("an employer needs to be able to determine the cause of an employee's aberrant behavior," and asking an employee to undergo mental examination to determine fitness for duty following unusual behavior is "not enough to suggest that the employee [was] regarded as mentally disabled"); *see also Cody v. CIGNA Healthcare of St. Louis, Inc.*, 139 F.3d 595, 599 (8th Cir. 1998) (a "request for an evaluation is not equivalent

19

to treatment of the employee as though she were substantially impaired. Employers need to be able to use reasonable means to ascertain the cause of troubling behavior without exposing themselves to [disability discrimination] claims").

Furthermore, although Plaintiff's personal doctor found that she could return to work without restrictions almost immediately, GM's psychiatrist disagreed. In situations where doctors retained by the employee and GM are at odds regarding an employee's ability to work, the CBA between GM and the UAW mandates that an independent medical examination (IME) be conducted that will be binding on the parties.  Pursuant to that first IME, Plaintiff remained on leave.  Later, when a second IME declared Plaintiff fit for duty, GM returned her to active employment, where she remains today.  The evidence here demonstrates without material dispute that Defendant and Plaintiff followed the contractually-negotiated procedures for medical evaluations, as mandated by the CBA.  In light of this record, Plaintiff has not established a genuine issue of material fact that GM discriminated against her due to any perceived mental disability.  As such, Defendant is entitled to summary judgment on this claim.

### D.   *Plaintiff Has Not Established a Worker's Compensation Retaliation Claim*

Next, Plaintiff alleges that the discipline and involuntary medical leave identified above were in retaliation for her request for worker's compensation benefits in connection with her workplace knee injury (Pl.'s Depo. at 157-158, 162). Plaintiff believes that these actions were retaliatory because they were based on

20

false allegations, and because the discipline started shortly after her knee injury occurred (*Id.* at 162-165).

The Michigan Worker's Disability Compensation Act, Mich. Comp. Laws § 418.301(11), prohibits an employer from discriminating against an employee for filing a worker's compensation claim.  Worker's compensation retaliation claims are also analyzed under the *McDonnell Douglas* burden-shifting framework. *See Dortman v. ACO Hardware, Inc.*, 405 F.Supp.2d 812, 822 (E.D. Mich. 2005) (citing *Chiles v. Machine Shop, Inc.*, 238 Mich. App. 462, 470, 606 N.W.2d 398 (1999)). Pursuant to this framework, a plaintiff must first establish a prima facie case by showing that: (1) she asserted her right to workers' compensation benefits; (2) the defendant knew she asserted her right to workers' compensation benefits; (3) the plaintiff suffered an adverse employment action; and (4) there was a causal connection between the plaintiff's assertion of her right to workers' compensation benefits and the adverse employment action.  *See DeFlaviis v. Lord & Taylor, Inc.*, 223 Mich. App. 432, 436, 566 N.W.2d 661, 664 (1997); *Dortman*, 405 F.Supp.2d at 822 (citing *Chiles*, 238 Mich. App. at 470, 606 N.W.2d 398).

If Plaintiff succeeds in establishing a prima facie case, this "creates a rebuttable presumption of discrimination, and the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for taking the challenged employment action." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 593 (6th Cir. 2007) (quoting *Carter v. Univ. of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003)). The ultimate burden of proving unlawful retaliation remains at all

21

times with Plaintiff. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

Plaintiff has not adduced the necessary evidence of a causal connection between the discipline she received and her worker's compensation activity. Plaintiff believes that the three disciplinary infractions at issue (November 19, 2012; January 22, 2013; and February 6, 2013) were retaliatory because, she contends, they were based on false allegations and they started shortly after her knee injury. However, Plaintiff's own testimony establishes that these disciplinary actions were not based on false or contrived allegations. Although the disciplinary violations occurred within weeks or months of Plaintiff's workplace injury, "[a] correlation between the time of the protected activity and time of the adverse action does not demonstrate a causal relationship." *See Menghini v. Edwards Auto.*, 2010 WL 4226959, *5 (Mich. App. Oct. 26, 2010). Furthermore, the evidence before the Court indicates that Plaintiff did not file a worker's compensation claim until *after* she was suspended for the mental health concerns that arose during the February 6, 2013 meeting (Pl's Depo. at 161-162), and long after the previous disciplinary infractions that occurred in the previous months of December 2012 and January 2013. In other words, the dates of the allegedly unjust discipline all *pre-date* Plaintiff's filing of a worker's compensation claim; such infractions therefore could not have been in retaliation for a worker's compensation claim that had not yet been filed.

22

Because Defendant could not have retaliated against Plaintiff for making a worker's compensation claim before Plaintiff ever filed her worker's compensation claim, Plaintiff's claim of worker's compensation retaliation must necessarily fail, and Defendant is entitled to summary judgment on this claim.

### E. Plaintiff Has Not Established a FMLA Retaliation Claim

Finally, Plaintiff claims that two of the days she took off from work – January 23 and 24, 2013 – should have been classified as FMLA days, which would have allowed her to use paid vacation time.  Plaintiff was not allowed to take paid time off on those dates because they fell on days when she was already off work, serving a one-week, unpaid disciplinary suspension for an infraction that occurred on January 22, 2013.

The Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 et seq. (the "FMLA"), entitles an eligible employee to a total of 12 weeks of unpaid leave per year for one or more of the following:

> (A) Because of the birth of a son or daughter of the employee and in order to care for such son or daughter.

> (B) Because of the placement of a son or daughter with the employee for adoption or foster care.

> (C) In order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition.

> (D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

> (E) Because of any qualifying exigency ... arising out of the fact that the spouse, or a son, daughter, or parent of the employee is on covered active

duty (or has been notified of an impending call or order to covered active duty) in the Armed Forces.

29 U.S.C. § 2612(a)(1). When medically necessary, such leave may be taken intermittently or on a reduced leave schedule. *Id.* § 2612(b)(1).

The Sixth Circuit recognizes two distinct theories for recovery under the FMLA: (1) the "entitlement" or "interference" theory arising under 29 U.S.C. § 2615(a)(1), and (2) the "retaliation" or "discrimination" theory arising under 29 U.S.C. § 2615(a)(2). *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 282 (6th Cir. 2012). In this case, Plaintiff is asserting the second type of FMLA claim – retaliation.

Under the retaliation theory (also known as the discrimination theory), the employer's motive is an integral part of the analysis. *See Edgar v. JAC Products, Inc.*, 443 F.3d 501, 508 (6th Cir. 2006). The employer's motive is relevant because retaliation claims impose liability on employers that take actions against employees specifically because those employees invoked their FMLA rights. *See Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 885 (7th Cir. 2005) (observing that the retaliation theory applies where a company seeks to punish an employee "for exercising rights or opposing an unlawful procedure").

Once again, the Court applies the familiar burden-shifting test articulated in *McDonnell Douglas* to retaliation claims under the FMLA. *See Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 313-16 (6th Cir. 2001) (applying the burden-shifting analysis to an FMLA-retaliation suit). Plaintiff can establish a prima facie

24

case of FMLA discrimination by showing that: (1) she availed herself of a protected right under the FMLA by notifying Defendant of her intent to take leave, (2) she suffered an adverse employment action, and (3) that there was a causal connection between the exercise of her rights under the FMLA and the adverse employment action. *See id*. at 314 (setting forth this framework); *Rodriguez v. Ford Motor Co.*, 382 F.Supp.2d 928, 933 (E.D. Mich. 2005) (applying this test to a retaliatory-discharge claim under the FMLA).  If the employee satisfies these three requirements, the burden shifts to the employer to proffer a legitimate, nondiscriminatory rationale for discharging the employee. *See Skrjanc*, 272 F.3d at 315.

Based on the record before the Court, Plaintiff has not established that Defendant interfered with her FMLA rights for the simple reason that Plaintiff received every FMLA benefit to which she was entitled.  Here, Plaintiff was only denied *pay* for the days off, which is not a benefit provided by the FMLA.  Plaintiff in fact received the primary benefit provided by the FMLA – *time off* from work to tend to her family medical issue.  As a result, Plaintiff cannot prove that GM interfered with any of her FMLA rights. *See Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 283 (6th Cir. 2012) (denial of some paid leave does not preclude a finding that the employee received all of the FMLA leave to which she was entitled). Consequently, Defendant is entitled to summary judgment on Plaintiff's claim of retaliation for the exercise of FMLA rights.

25

### III.  CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment

(Dkt. 11) is **GRANTED** and this case is **DISMISSED WITH PREJUDICE**.

**SO ORDERED.**

s/Terrence G. Berg
TERRENCE G. BERG
UNITED STATES DISTRICT JUDGE

Dated:  March 29, 2016

### Certificate of Service

I hereby certify that this Order was electronically submitted on March 29, 2016, using the CM/ECF system, which will send notification to each party.

s/A. Chubb
Case Manager
